749 A.2d 425 (2000)
330 N.J. Super. 288
K.S. and B.S., Plaintiffs-Respondents,
v.
ABC PROFESSIONAL CORPORATION, F.G., M.G., T.F., F.C., A.M., R.M., and J.B., Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued April 4, 2000.
Decided April 28, 2000.
*426 Cheryl A. Whitney, Morristown, for defendants-appellants (Drinker Biddle & Shanley, attorneys; Thomas F. Campion and Kathleen B. Harden, on the brief).
Joseph P. Skripek, Fairfield, for plaintiff-respondent K.S.
B.S., plaintiff-respondent, pro se.
Before Judges PRESSLER, CIANCIA and ARNOLD.
The opinion of the court was delivered by PRESSLER, P.J.A.D.
This is a hostile work environment sexual harassment action still in its discovery stage. The gravamen of the complaint is that plaintiff, K.S., a member of the bar of this State, was raped twice by defendant A.F., one of the partners of the firm by which she was employed as an associate between August 1996 and April 1997, when she left on psychiatric disability leave and did not return. The first rape is alleged to have occurred in Boston in October 1996 when she and A.F. were attending a seminar there together, and the second in January 1997 when she had to stay overnight in Atlantic City on litigation business. She also alleged that in December 1996, A.F. attempted to sexually assault her when they were returning from a business meeting. She filed this complaint against the law firm, ABC Professional Corporation, and each of its partners in January 1998. Her husband, B.S., who sues per quod and is not an attorney, is appearing pro se.
During the course of the depositions of some of the partners of the firm other than A.F., plaintiff K.S., by her attorney, and B.S., pro se, sought to examine them about their consensual and voluntary sexual relations, if any, with any woman who had ever worked for the firm as an associate or secretary. Defendants' attorney made a telephone application to the court pursuant to R. 4:14-4 to limit the scope of the examination by barring this line of inquiry. That attorney represents the firm and all the partners except A.F., who is separately represented. Upon denial of the application, defendants filed a motion seeking the same relief by way of a protective order under R. 4:10-3(d). The motion was denied, the judge, not the judge who heard the telephone application, ruling that "[p]laintiff is permitted to inquire at depositions about any and all sexual relationships or conversations of a sexual nature between the partners and employees *427 of the firm, including associates and clerical staff." Defendants moved for leave to appeal, claiming that their voluntary, consensual and welcomed sexual liaisons were beyond the scope of discovery in this case. We granted leave to appeal, and reverse the order to the extent it includes the required disclosure of such liaisons.
It is important to point out at the outset that our reference hereafter to defendants includes only the law firm and the partners other than A.F., the alleged assailant, whose defense is based on the alleged consensual nature of his relationship with K.S.
To begin with, we appreciate the broad scope of permissible discovery. We understand that discovery is not limited to obtaining admissible information but, rather, includes the obtaining of any information, not otherwise privileged, that "appears reasonably calculated to lead to the discovery of admissible evidence...." R. 4:10-2(a). See, e.g., Payton v. New Jersey Turnpike Authority, 148 N.J. 524, 535, 691 A.2d 321 (1997). On the other hand, the scope of discovery is not infinite. It is limited by R. 4:10-2(a) to information that is "relevant to the subject matter involved in the pending action...." The definition of relevancy in this context is supplied by N.J.R.E. 401. Evidence is relevant if it has a "tendency in reason to prove or disprove any fact of consequence to the determination of the action." See Payton, op cit., supra. Obviously the line of questioning that is the subject of the court's order here, to the extent it includes sexual relations between consenting adults, is unavoidably offensive to the person being interrogated, impinging, as it does, on the most intimate details of one's life and rending the cloak of privacy to which such matters are customarily entitled. That consideration would not, however, be sufficient by itself to warrant a protective order. We reverse the denial of that protection here because our review of the record convinces us this information, in this case, is not relevant to plaintiffs' hostile work place theory against defendants since it cannot "in reason ... prove or disprove any fact of consequence to the determination of the action" as it has been pleaded and prosecuted by plaintiffs.
In coming to that conclusion, we start with the complaint. Plaintiffs allege that K.S. was hired as a senior associate in the environmental coverage department of defendant law firm, which then consisted of about 26 lawyers, both partners and associates. A.F. was the head of that department. Consequently, A.F. was K.S.'s supervisor and they worked closely together. We think it is perfectly clear that if she had been raped by her supervisor as she alleges or if he had acted improperly towards her in a sexual manner, then, aside from any cause of action for assault she would have against him, she was certainly being subjected thereby to a hostile work environment. Rape is surely the ultimate form of sexual harassment. Having to have daily professional contact with a supervisor by whom one has been raped twice, subjected to other unwanted sexual contact, and threatened with loss of employment and other professional reprisals may well be the ultimate in a sexually harassing hostile work place environment. But we are not concerned here with A.F.'s creation of and responsibility for this hostile work environment. If he raped K.S. or otherwise sexually assaulted her, his responsibility is obvious. The issue before us, rather, concerns the responsibility of the law firm and its other partners for A.F.'s alleged actions and the scope of K.S.'s legitimate discovery of facts tending to prove the nature and scope of that responsibility.
As a matter of factual context, it is, first, not disputed that during the entire course of her employment, from August 1996 to April 1997, K.S. did not complain to anyone in the firm about A.F.'s alleged actions. She surmises that any such complaint would have been futile and she would not have been believed. We will return to that theme later, but note for *428 now that there is nothing at all in the complaint to substantiate her bare allegation that the other partners, or any of them, actually knew about A.F.'s alleged conduct or to substantiate her surmise that A.F. probably told them about it himself. Indeed, her primary leitmotif is not that defendants knew of A.F.'s conduct but that they should have known. And the only reason alleged in the complaint for this constructive knowledge is that "A.F. was or should have been observed by the Principals spending an inordinate and inappropriate amount of time with K.S. in her offices, observing her and her activities." The suggested implication is that one or more of the partners should have realized that the time A.F. spent in K.S.'s office exceeded the normal demands of their close professional association, and, moreover, that the reason therefor was that A.F. had sexually harassed her, or was harassing or was proposing to harass her. Indeed, her express allegation is that defendants were negligent in not coming to this realization and, therefore, in not protecting her from A.F.
This theory was somewhat differently developed during the course of discovery. During her deposition, K.S. took the stance that the other partners were themselves sexually irresponsible in their relationships with other women associates and female secretaries, thereby creating an environment that condoned, if not actively encouraged A.F., and leading her to the reasonable conclusion that they would not take any action against A.F. even if she had told them he had raped her. In sum, the apparent theory then advanced was that because of their own conduct, they would tolerate sexual harassment by any of the other partners, including rape. At the least, she surmised, they would construe her accusation of rape as her having been A.F.'s willing partner.
We think it clear that by advancing these theories of her case, K.S. was endeavoring to invoke the principles of employer liability for the sexual harassment of an employee by her supervisor as defined by Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 626 A.2d 445 (1993). There is no question of the employer's strict liability for equitable damages and relief. Id. at 592, 626 A.2d 445. But the only proof required to impose strict liability is the employment relationship between the employer, the harassing supervisor and the harassed employee. The employer's conduct becomes relevant only when compensatory and punitive damages are sought, as is the case here. Lehmann makes it clear that vicarious liability for purposes of imposing compensatory damages may be imposed even when the alleged conduct of the supervisor is beyond the scope of his employment, and, patently, the rape of an employee committed by a supervisor outside the workplace is beyond the scope of the supervisor's employment. Id. at 624, 626 A.2d 445. As Lehmann summarized the circumstances warranting the imposition of vicarious liability for a supervisor's conduct that is outside the scope of his employment:
Moreover, even if the supervisor acted outside the scope of his or her employment, the employer will be vicariously liable if the employer contributed to the harm through its negligence, intent, or apparent authorization of the harassing conduct, or if the supervisor was aided in the commission of the harassment by the agency relationship. Thus, an employer can be held liable for compensatory damages stemming from a supervisor's creation of a hostile work environment if the employer grants the supervisor the authority to control the working environment and the supervisor abuses that authority to create a hostile work environment. An employer may also be held vicariously liable for compensatory damages for supervisory sexual harassment that occurs outside the scope of the supervisor's authority, if the employer had actual or constructive notice of the harassment, or even if the employer *429 did not have actual or constructive notice, if the employer negligently or recklessly failed to have an explicit policy that bans sexual harassment and that provides an effective procedure for the prompt investigation and remediation of such claims. [Id.]

Relating these principles to plaintiffs' pleading and discovery allegations, we understand them to be predicating their claim of vicarious liability on (1) defendants' asserted contribution to the harm through their negligence, intent or apparent authorization of the harassing conduct; (2) defendants' actual or constructive knowledge of the harassing conduct; and (3) defendants' negligent or reckless failure to have an effective policy banning sexual harassment providing an effective procedure for the prompt investigation and remediation of such complaints. We conclude that the disputed line of questioning is not relevant to prove any of these theories of vicarious liability.
We first address the "contribution to harm" theory because, as we understand it, that was the basis of the court's denial of the protective order. Insofar as we are able to determine, the judge concluded that there was enough in the record to factually support the plaintiffs' proffered portrayal of the firm and its partners as sexual harassers or at least as tolerant of sexual harassment. This is what the judge said in his letter opinion denying defendants' motion for reconsideration of his denial of their motion for a protective order:
Plaintiffs allege a licentious atmosphere existed throughout the law office involving partners, associates and staff. (Appellants' Br. at Da55-58; Da75.) Plaintiff K.S. has suggested that certain partners may have had sexual relationships with other members and staff of the firm. (Appellants' Br. at Da55-58.) Plaintiff K.S. also stated in her deposition that she was told the partners "tried to get women." (Appellants' Br. at Da75.)
Additionally, plaintiff certified that defendant A.F. told her about alleged liaisons between partners and subordinates as well as an alleged sexual encounter between defendant F.G. and a client. (Pl.'s Certif. dated September 27, 1999.) Plaintiff stated that defendant A.F. threatened her that she would lose her job if she told anyone about the misconduct. (Pl.'s Certif. dated September 27, 1999.) Plaintiff also certified that one partner was infatuated with a particular secretary whom no one in the firm could touch as she was his "personal property." (Pl.'s Certif. dated September 27, 1999.)
These allegations suggest that a generally ribald atmosphere may have existed at the firm which could possibly have created a hostile work environment. Plaintiff's allegations taken as a whole support the contention that plaintiff could not complain about defendant A.F.'s conduct because the other partners were engaging in similar behavior. Plaintiff has alleged that defendant A.F. made it clear to her that the firm carried on in such manner and that her job security was dependent upon her keeping quiet about the alleged misconduct. Thus, any complaint made by plaintiff would have received little, if any, attention or action on the part of the other partners. This also has to be considered in light of plaintiff's allegation that any mention of defendant A.F.'s purported sexual misconduct would have severe ramifications. Therefore, based on these allegations, inquiries into partners' sexual relationships with other members of the firm and staff certainly fall within the scope of discovery under R. 4:10-2(a). Such information would be relevant in order for plaintiff to prove the elements of her sexual harassment claim and possibly may be relevant on issues of credibility.
If there were anything in this record to support the judge's characterization of life in the firm as enveloped by a licentious *430 and ribald atmosphere, we might well conclude differently. But having carefully scrutinized this record, we can find no such support. First, there is nothing in this record, including the depositions, to even remotely suggest that but for A.F.'s alleged conduct towards plaintiff K.S., there was ever a hint in the day-to-day affairs of the firm that any other partner acted in the slightest way inappropriately by speech or deed. There is no suggestion of any touching at all or of any direct or implied sexually connotative remarks or gestures. Certainly K.S. herself does not so assert either with respect to herself or any other employee of the firm. Nor does she suggest that there was any dating going on in the office or even any particular fraternization beyond the normal comradery of people working in the same small office. What then is there? Obviously, arguments made in plaintiff's brief, apparently heavily relied on by the judge, do not constitute facts and should not have been regarded by him as such. That leaves only plaintiff K.S.'s deposition testimony that A.F., the alleged rapist, warned her about the loss of her job if she "told" and that he also told her about the activities and predilections of the other partnershearsay that is entirely uncorroborated, except as hereafter noted. This is how K.S. summed up that hearsay in response to a question asking her the basis for her allegation that the partners knew or should have known of A.F.'s "propensity to commit sexual assault":
Because he [A.F.] said that they, you know, they were all doing this. They wentthey went out with clients, and some lady client slept with ... [F.], and that they were always trying to, you know, get women, that they talked dirty things about ... [W.D.] and that when they were at the other office, that was before they moved to [specified municipality], they were always trying to get women.
In the absence of any personal experience or observation, any corroborating communication from any other employee, or indeed any shred of corroboration at all, we hardly think that the alleged braggadocio of the alleged rapist to his victim can be elevated to the status of a reliable suspicion that the partners were creating a licentious and ribald atmosphere in the office, particularly since A.F. himself was deposed, and as far as the record before us shows, these matters were not pursued with him.
As a result of other revelations by A.F. to K.S., she did pursue, both before and after the telephonic denial of a protective order, other lines of inquiry with several partners. One disclosed that some seven years earlier, long before K.S. came to the firm, and while he was separated from his wife, he had an affair with his secretary, whom he then married. Another partner had shared a beach house one summer with a woman associate and seven other persons and denied, on questioning by B.S., that their relationship had any sexual aspect. That partner had also begun dating the daughter of one of the firm's secretaries about a month before she, the daughter, also then employed by the firm, left, and a four-year romantic relationship, since terminated, ensued between them.[1] This was also well before K.S.'s arrival on the scene.
We are convinced that these facts do not remotely support an inference that these several, long-past, isolated events created the alleged ribald and licentious atmosphere surrounding the firm. We are left with the perception that what K.S. is really arguing is that if a member of this law firm had a private, discreet, consensual and welcomed sexual relationship with an *431 employee, he would be likely to condone the rape of another employee by another partner. In our view, that proposition is contrary to logic, common sense and common experience. Sex is not congruent with sexual misconduct, and that is the essential fallacy of plaintiffs' theory. We thus conclude that in this case, in view of the allegations made and, particularly, the allegations not made, whether any partner ever had a consensual and welcomed relationship with an employee is irrelevant to plaintiffs' claim that a hostile work environment was created or tolerated by defendants.
With respect to plaintiffs' claim that one or more partners knew or should have known that she was being victimized by A.F. because of the excessive time he allegedly spent in her office, we do not see how a given partner's private life would have affected his appreciation of whether the time A.F. was spending with her in the office, if excessive in view of their professional relationship, was for non-professional reasons.
We are also satisfied that plaintiffs' claim of a negligent or reckless failure to institute and implement an anti-harassment policy cannot be advanced by proofs respecting the partners' private lives. According to the depositions, there was a poster on the wall of the kitchen which was on display for all employees, including K.S. The poster announces that sexual harassment is illegal; describes examples of sexual harassment, none of which are alleged by anyone to have occurred in this workplace;[2] describes the disciplinary penalties available for dealing with sexual harassment, and advises a victim of or witness to sexual harassment to report it to "your supervisor or human resources manager." The deposition testimony was that the employee of the firm assumed to act as human resources manager was the office manager, on whose desk, as well as at other locations, pamphlets respecting sexual harassment were kept. There was no other firm policy on the subject. Whether the poster and the availability of the pamphlets constituted an adequate statement and enforcement of policy may well be a jury question. We do not, however, believe the jury would be aided in this determination by knowing whether or not any partner had ever had a consensual relationship with an employee since once again, the relevance of such a relationship requires the leap over what we regard as the unbridgeable gap from having an affair to the condoning of rape. Clearly, how an employer investigates complaints of sexual harassment is highly relevant to its antisexual harassment stance. See, e.g., Payton v. New Jersey Turnpike Auth., supra, 148 N.J. 524, 691 A.2d 321; Connolly v. Burger King Corp., 306 N.J.Super.344, 703 A.2d 941 (App.Div.1997). But that issue is not involved here. No complaints were ever made to anyone.
In coming to the conclusions we have reached, we do not intend to depreciate the seriousness of a sexually harassing hostile work place or our commitment to its eradication and to the affording of appropriate remedies to its victims. But that commitment does not justify a license for free-ranging discovery into matters that are not relevant to proof of the charges actually made in a given case and whose effect, if not its purpose, is to embarrass and humiliate.
The portion of the order appealed from requiring defendants to disclose their consensual, voluntary and welcomed sexual relations conducted out of the workplace is reversed.
NOTES
[1] Not only did B.S. insist on asking that partner if, during the course of that affair, he had sexual relations with the woman, but also wanted to know "[was] it normal sex?" We can only surmise that events that have recently occurred on the national scene have, regrettably, caused both a general desensitizing to matters of privacy and the encouraging of voyeurism in the bedroom.
[2] Among the noted examples are unwelcome sexual advances and unwanted hugs, touches or kisses. (Emphasis added.) The other examples are by definition unwelcome and unwanted.