954 A.2d 527 (2008)
402 N.J. Super. 392
R.L., Plaintiff-Appellant/Cross-Respondent,
v.
Kenneth VOYTAC, Defendant-Respondent/Cross-Appellant.
No. A-1001-06T5.
Superior Court of New Jersey, Appellate Division.
Argued March 31, 2008.
Decided September 5, 2008.
*529 E. Carr Cornog III argued the cause for appellant/cross-respondent (The Rotolo Law Firm, attorneys; Victor A. Rotolo, of counsel and on the brief; Mr. Cornog, on the brief).
*530 William G. Johnson, Dover, argued the cause for respondent/cross-appellant (Johnson & Johnson, attorneys; Mr. Johnson, of counsel and on the brief).
Before Judges A.A. RODRÍGUEZ, C.S. FISHER and C.L. MINIMAN.
The opinion of the court was delivered by
RODRÍGUEZ, A. A., P.J.A.D.
This appeal presents a statute of limitations issue with respect to the Child Sexual Abuse Act (CSAA), N.J.S.A. 2A:61B-1. The CSAA provides in pertinent part:
In any civil action for injury or illness based on sexual abuse, the cause of action shall accrue at the time of reasonable discovery of the injury and its causal relationship to the act of sexual abuse. Any such action shall be brought within two years after reasonable discovery.
[N.J.S.A. 2A:61B-1b.]
Here, the abuse was allegedly committed against R.L. by defendant between 1987 and 1990, when R.L. was ten to twelve years old. R.L. did not file this complaint until February 13, 2004, nearly fourteen years after the last alleged incident of abuse. At the time, R.L. was twenty-five years old. According to R.L., he was aware of the abuse since its occurrence. However, he discovered in late February 2002, that as a result of the abuse, he was suffering from depression, cross-dressing and gender confusion. He had assumed prior to February 2002, that these feelings and conduct were a reflection of his belief that he was "supposed to be born a girl."
R.L. filed suit. Defendant moved to dismiss the complaint as time barred pursuant to N.J.S.A. 2A:61B-1b. Following a plenary hearing, the judge found that the cause of action accrued in 1999, during a sexual encounter between R.L. and his girlfriend. The complaint was dismissed with prejudice. We reverse and remand for trial.
R.L. was born in 1978 and was nine-years old when his mother married defendant. When R.L. was ten-years old, he fell asleep on the couch and awoke to find defendant touching his penis. Defendant told R.L. that "it might not be a good idea" for him to tell anyone. A similar incident took place in the summer of 1989. Further incidents occurred where defendant and R.L. rubbed each other's penises, ejaculated, and engaged in oral sex. The last incident occurred when R.L. was eleven or twelve. His mother divorced defendant soon thereafter. According to R.L., there were five to ten incidents of sexual activity with defendant. The sexual contact made R.L. feel "special."
During R.L.'s high school years, he started cross-dressing and had trouble in school. By his senior year, the problem had grown worse. R.L. was treated for depression from March to September 1996 by David Durka, Ph.D., a psychologist. However, R.L. did not discuss at that time either the sexual abuse or his cross-dressing. Around this time, R.L. was arrested for stealing electronic equipment and for driving while intoxicated. R.L. also started abusing drugs.
In September 1999, R.L. began his first serious relationship with "Sally."[1] In October 1999, Sally was performing fellatio on R.L. when R.L. had a "flashback" of engaging in oral sex with defendant. R.L. immediately stopped the act. He told Sally that he was tired and began crying. The following day, R.L. told Sally that defendant had sexually abused him. Later that day, R.L. became upset at work, left *531 early and walked home. He called his mother at her work and asked her to come home. Upon his mother's return, R.L. told her that defendant had "done things" to him when he was younger. R.L. tried to reassure his mother that the abuse was not a "big deal" and that it was in the past. His mother told him, "we need to deal with it" and "there was no way this hasn't affected you."
R.L. did not seek psychological treatment after this incident, which led to an increase in cross-dressing and gender confusion. He also began exhibiting an interest in pornography of a transgender nature.
Towards the end of February 2002, R.L. had a conversation with a co-worker. She initiated the conversation because she noticed that R.L. seemed to be bothered by something. When she asked R.L. what was wrong, he said that he did not feel right. He confided in her that he had been trying on women's underwear and that that made him feel uncomfortable. The co-worker described R.L. as appearing ashamed and upset. She then asked him whether there was something in his past that might be related to the cross-dressing. She specifically asked whether he had been sexually abused. According to the co-worker, R.L. "sat back and took some deep breaths," before responding affirmatively. The co-worker then asked R.L. whether he thought there was a connection between the abuse and the cross-dressing. The co-worker testified at the hearing that R.L. sat back, was very pensive, and had a shocked look on his face, "like a light bulb kind of look." The co-worker suggested that R.L. see a psychiatrist.
R.L. described his reaction to the co-worker's question as one of shock because he had previously believed that the cross-dressing and gender confusion was something he had been born with. He had never made a connection between the cross-dressing and the sexual abuse before the conversation with the co-worker.
R.L. made an appointment to see Durka. During the same week as the appointment, R.L. wrote two documents, clarifying his thoughts. In one, R.L. described the anxiety he felt as he was about to see Durka. In the other one, R.L. indicated that he had been feeling "quite confused" because of the incident with Sally and "repressed emotions" regarding the sexual abuse. R.L. indicated that at this time he "realize[d]" that his cross-dressing and feelings that he was "supposed to be born a girl," were probably a direct result of the abuse.
R.L. had several sessions with Durka. Durka testified that during the first one on February 28, 2002, R.L. appeared "shaky" and unsure of himself. By the second consultation, R.L. was more confident and assertive, "like he had grown in size." According to Durka, the conversation with the co-worker "precipitated" an "avalanche of awareness" on R.L.'s part.
In the summer of 2002, R.L. saw Jay D. Kuris, M.D. Kuris noted that R.L. had analyzed his situation obsessively for many years. R.L. told Kuris that he used to think about the abuse and get depressed.
Ralph Wahl Battinieri, Ph.D., testified for R.L. as an expert in the fields of clinical social work and child sexual abuse. According to Battinieri, there was nothing to suggest that R.L. had made a connection between the abuse he suffered and the problems in his life before his February 28, 2002 session with Durka. Battinieri described the connection as a "gradual process," and that R.L. had still not made the connection fully at the time he met with him. Battinieri opined that the incident with Sally was merely a "flashback." He also opined that R.L.'s conversation *532 with his mother the following day did not constitute a connection between the abuse and R.L.'s problem because R.L. did not tell his mother how the abuse was impacting him. He did not blame her for not protecting him. Battinieri also opined that the remark by R.L.'s mother did not create a connection because R.L. did not respond to the remark, nor did he seek treatment immediately thereafter. Finally, Battinieri concluded that R.L. was coerced by defendant into not talking.
Pamela F. Moss, M.D., a psychiatrist, also testified on R.L.'s behalf. According to Moss, R.L. did not make a connection between the abuse and his condition until February 2002. She concluded that R.L.'s cross-dressing, depression, drug and alcohol abuse, as well as the incident with Sally, were all insufficient to make that connection. According to Moss, R.L.'s statements to his mother and Sally the day after the incident were mere explanations of his behavior. Moss also opined that R.L. was under psychological duress from defendant.
Louis B. Schlesinger, Ph.D., a psychologist and expert in forensic psychology, testified on behalf of defendant. Schlesinger opined that R.L. possibly made a connection between the abuse and the problems from which he was suffering as early as 1990, but definitely had done so by 1999. Schlesinger cited R.L.'s abnormal fixation on penises as constituting a connection. Schlesinger added that R.L. made the connection while engaging in oral sex with Sally, and in his conversations with Sally and his mother the following day. According to Schlesinger, R.L. was not prevented by any duress from bringing a lawsuit earlier because he had not lived with defendant in years. There was no showing that defendant threatened R.L. in any way.
At the conclusion of the plenary hearing, the judge found "highly significant" that at no time throughout the relevant time period did R.L. have repressed memories of the alleged abuse. The judge concluded that R.L.'s recitation of the negative connotation and the impact of the abuse on his psyche while receiving oral sex from Sally in 1999 "reflected at least some level of understanding . . . that what [defendant] had done to him was wrong and very, at the very least, injurious to him. There is no other rational explanation for the conduct." The judge further noted R.L.'s conversation with his mother and that R.L.'s statement that he began cross-dressing after the incidents with defendant indicated awareness on his part.
Just before the complaint was filed, R.L. moved for discovery of defendant's computers used in connection with defendant's business. A forensic analysis performed by a consultant hired by defendant in May 2005 found no evidence that the computer hard drives in question were used to store or view child pornography. However, the agreed-upon expert, Stroz Friedberg, LLC, examined four hard drives found in defendant's three computers in September 2005. Stroz Friedberg did not recover child pornography on any of the hard drives. Friedberg did note, however, that additional data storage devices not previously disclosed were used in connection with two of the three computers, and that a wiping utility was used on the drives. Stroz Friedberg was able to discover files on one of the computers indicating that the user had at one time accessed various child and non-child pornography sites.
Acronis, a software program designed to protect users from spyware, was discovered on the three hard drives. Acronis had first been installed on one of the computers on February 6, 2004. Friedberg concluded that overwritten data found in the *533 free space of two of the computers' hard drives, combined with use of Acronis, indicated that the user eliminated certain data by overwriting free space with a wiping or data-elimination tool.
In response, defendant filed an affidavit in which he denied destroying evidence and asserted that he installed the Acronis software to protect sensitive business data from various types of computer hackers and viruses. Defendant maintained that when he first installed the software, he had no idea that his computers would have any part in the lawsuit. Finally, he denied viewing or storing child pornography on any of the computers.
R.L. moved for a spoliation inference and to amend his complaint. The judge denied the motion and entered an order to this effect on January 24, 2006.

Triggering of the Cause of Action
On appeal, R.L. contends that the judge erred by dismissing the complaint with prejudice. We agree.
We begin our analysis by noting two overarching principles. One, the CSAA is a remedial statute and therefore should be interpreted liberally. Hardwicke v. Am. Boychoir Sch., 188 N.J. 69, 90, 902 A.2d 900 (2006). Second, child sexual abuse cases present unique difficulties. As was noted with respect to a similar Washington statute:
That is, the victim may know . . . that he or she was molested, and may even know that some injury resulted, but may not know the full extent of the injury.. . . Indeed, as our Legislature has found, childhood sexual abuse, by its very nature, may render the victim unable to understand or make the connection between the childhood abuse and the full extent of the resulting emotional harm until many years later. Until that "disability" is lifted, the cause of action either will not accrue or, if accrued, the running of the statute of limitations will be tolled.
[Cloud v. Summers, 98 Wash.App. 724, 991 P.2d 1169, 1175 (1999).]
The CSAA established the first statutory cause of action for sexual abuse in New Jersey. Id. at 84, 902 A.2d 900. Prior to that time, victims of sexual abuse were limited to common law remedies and constrained by the two-year statute of limitations for tort actions. Id. at 85, 902 A.2d 900.
There is little case law in New Jersey on the question of what constitutes accrual and tolling pursuant to the CSAA. The express language of the statute provides that, "the cause of action shall accrue at the time of reasonable discovery of the injury and its causal relationship to the act of sexual abuse." N.J.S.A. 2A:61B-1b (emphasis added). In R.L. v. State-Operated Sch. Dist. of the City of Newark, 387 N.J.Super. 331, 339, 903 A.2d 1110 (App. Div.2006), we held that plaintiff's cause of action accrued on the date he discovered he was HIV-positive and recognized that his injury was a consequence of a sexual relationship he had with his high school teacher. Here, the injuries are emotional. For that reason, the event triggering the statute is less clear cut. However, it is clear that conscious awareness of the causal relation of the abuse to the injury is required.
Generally, the party seeking to avoid the application of the statute of limitation bears the burden of proof. Lopez v. Swyer, 62 N.J. 267, 276, 300 A.2d 563 (1973). It is not so much the facts as determined by the trial court, but the legal significance of those facts that should be evaluated in terms of the trial court's conclusion. Vispisiano v. Ashland Chem. Corp., 107 N.J. 416, 428, 527 A.2d 66 *534 (1987). Experience has shown that a person's "awareness of an injury or deleterious condition does not always equate with the accrual of a cause of action." Id. at 427, 527 A.2d 66. The statute requires and decisional law has emphasized that a "plaintiff's knowledge of the fact of abuse and its causal relationship to injury must exist in order for the CSAA statute of limitations to commence." D.M. v. River Dell Reg'l High Sch., 373 N.J.Super. 639, 645-46, 862 A.2d 1226 (App.Div.2004), certif. denied, 188 N.J. 356, 907 A.2d 1016 (2006). In our view, pursuant to the CSAA, a claimant may have a conscious memory of the sexual abuse, but may not have "reasonably discovered" that the serious psychological and mental illness injury from which the claimant suffers is caused by that sexual abuse. See J.L. v. J.F., 317 N.J.Super. 418, 434, 722 A.2d 558 (App. Div.), certif. denied, 158 N.J. 685, 731 A.2d 45 (1999).
We conclude that here, such confluence of factors did not occur sooner than February 2002. Therefore, R.L.'s suit was timely filed on February 13, 2004. We reject the judge's analysis because he focused on the facts that R.L. had no repressed memories of the abuse and had a flashback of the abuse in 1999 during the incident with Sally. That is not enough for the cause of action to accrue.
There are two California cases worth noting. In Lent v. Doe, 40 Cal.App.4th 1177, 47 Cal.Rptr.2d 389, 391 (1995), the plaintiff alleged that he was sexually molested by his uncle when he was twelve. As a result of these acts, the plaintiff developed feelings of "deep shame, self-blame and self-loathing." Ibid. He coped with these feelings by using alcohol and drugs and eventually dropped out of high school. Ibid. The plaintiff was described as "an angry, alienated and sometimes suicidal person." Ibid. The trial court sustained the uncle's demurrer on statute of limitations grounds. Ibid.
The California Court of Appeals reversed, pursuant to the applicable California statute of limitations, which requires that an action for childhood sexual abuse be commenced "within eight years of the date the plaintiff attains the age of majority or within three years of the date the plaintiff discovers or reasonably should have discovered that psychological injury or illness occurring after the age of majority was caused by the sexual abuse, whichever period expires later." Id. at 390. The court held that neither the plaintiff's admission that he was injured at the time of the abuse nor the fact that his memory of the abuse was never repressed vitiated his entitlement to the delayed discovery provision of California's child sexual abuse statute, thereby rendering his action timely. Id. at 393-94.
Similarly, in Sellery v. Cressey, 48 Cal. App.4th 538, 55 Cal.Rptr.2d 706, 708 (1996), the plaintiff alleged she did not make the connection between the sexual abuse by her parents and the psychological ailments she subsequently suffered until she was in psychotherapy in 1991, more than twenty years after the abuse had ended. She filed a sexual abuse complaint against her parents in 1992. Ibid. The trial court granted summary judgment to the parents, based on the statute of limitations. Id. at 709.
The California Court of Appeals reversed and held that the complaint was timely filed because it was only while undergoing psychotherapy that the plaintiff could "appreciate the wrongfulness of her parents' child sexual abuse" and how the "abuse caused her emotional pain and injuries in her adulthood." Id. at 708, 712. In so holding, the court rejected the parents' contention that the complaint was time-barred after 1987 because the psychological *535 problems for which the plaintiff eventually sought treatment had manifested themselves in 1984, thereby triggering the three-year statute of limitations. Id. at 712. The court cited the expert psychological testimony offered by the plaintiff, which indicated that she used various defense mechanisms to fend off "having full conscious awareness of the ways in which such abuse had damaged her as an adult[,]" which in turn made her "unable to truly appreciate the significance" of the abuse and to act upon them. Ibid.
Here, it was only while undergoing psychotherapy after his February 2002 conversation with The co-worker that R.L. could appreciate that the abuse caused him emotional injuries. R.L.'s earlier sessions with Durka did not delve into that abuse. See also J.L., supra, 317 N.J.Super. at 434, 722 A.2d 558 ("It is well recognized that the resulting injury from sexual abuse can manifest itself in a wide range of behavioral, emotional and psychological symptoms or illnesses").
Alternatively, R.L. contends that even if the cause of action accrued in 1999, when he told Sally and his mother that defendant had "done things to [him]," the statute of limitations was tolled because he could not recognize the cause of his injury until late February 2002, due to his "crippled" mental state. Given our holding that the suit was timely filed on February 13, 2004, we do not address this issue.

The Spoliation Inference
R.L. also appeals the January 24, 2006 order denying his application for a spoliation inference. He argues that the trial court erred in denying his motion for an adverse inference with respect to defendant's alleged spoliation of computer evidence, specifically defendant's installation of a security software program only days after receiving the request for computer discovery.
We need not decide this issue. The judge denied R.L.'s motion for a spoliation inference without prejudice. Therefore, R.L. may renew his motion again prior to trial. We add only the following remarks to help guide the retrial judge.
A spoliation inference may be used where a litigant is found to have destroyed or concealed evidence during the underlying litigation. Rosenblit v. Zimmerman, 166 N.J. 391, 401, 766 A.2d 749 (2001). The inference is used as a method of "evening the playing field[.]" Ibid. "It essentially allows a jury . . . to presume that the evidence the spoliator destroyed or otherwise concealed would have been unfavorable to him or her." Id. at 401-02, 766 A.2d 749. In order for the spoliation inference to apply, four essential factors must be satisfied: (1) the evidence in question must be within the party's control; (2) it must appear that there has been actual suppression or withholding of evidence; (3) the evidence destroyed or withheld must be relevant; and (4) it must have been reasonably foreseeable that the evidence would later be discoverable. MOSAID Techs., Inc. v. Samsung Elecs. Co., 348 F.Supp.2d 332, 336 (D.N.J.2004).

The Motion To Amend The Complaint
The judge denied, with prejudice, R.L.'s request to amend his complaint to add a count alleging fraudulent concealment of evidence. R.L. claims this was error, and we agree.
Motions to amend complaints should be liberally granted even when the ultimate merits of the amendment are uncertain. Kernan v. One Washington Park Urban Renewal Assocs., 154 N.J. 437, 456-57, 713 A.2d 411 (1998). Whether to grant such a motion rests within the trial *536 court's discretion. Notte v. Merchs. Mut. Ins. Co., 185 N.J. 490, 501, 888 A.2d 464 (2006). "That exercise of discretion requires a two-step process: whether the non-moving party will be prejudiced, and whether granting the amendment would nonetheless be futile." Id. at 501, 888 A.2d 464. The prejudice in question must be undue. Franklin Med. Assocs. v. Newark Public Schs., 362 N.J.Super. 494, 506, 828 A.2d 966 (App.Div.2003).
New Jersey courts recognize that the tort of fraudulent concealment applies to intentional spoliation of evidence. Rosenblit, supra, 166 N.J. at 406-07, 766 A.2d 749. The elements of that tort are: the defendant had a legal obligation to disclose evidence in connection with an existing or pending litigation; the evidence was material to the litigation; the plaintiff could not have reasonably obtained access to the evidence from another source; the defendant withheld, altered or destroyed the evidence with purpose to disrupt the litigation; and the plaintiff was damaged by having to rely on an evidential record that did not contain the evidence the defendant concealed. Ibid. Such a claim requires bifurcation because the fraudulent concealment remedy depends on the jury's assessment of the underlying action. Id. at 407, 766 A.2d 749.
Here, there would be no undue prejudice to defendant. The computer evidence is of recent vintage, and the computers already have been examined and reports prepared. As for the futility question, only when the proposed amendment is "not sustainable as a matter of law" should the motion to amend be denied. Interchange State Bank v. Rinaldi, 303 N.J.Super. 239, 256-57, 696 A.2d 744 (App. Div.1997). We conclude, based on the report of the independent expert, that R.L. has made out a prima facie case of fraudulent concealment. Consequently, his motion to amend the complaint should have been granted. However, as noted above, whether the evidence in support of that claim is material and admissible are separate matters, ones that should be determined on remand prior to the start of trial.

The Cross-Appeal
On cross-appeal, defendant contends that R.L.'s request for an examination of defendant's computers should have been denied because it violated R. 4:10-2(a) as not relevant to the subject matter of the pending action.
This issue would appear to be moot, given that the examination has already taken place. Defendant does seek reimbursement of all costs associated with the forensic analysis stemming from the ruling. However, because defendant does not appear to have sought this relief in the Law Division, it is not properly raised on appeal.
Discovery matters are ordinarily left to the trial court's discretion. Connolly v. Burger King Corp., 306 N.J.Super. 344, 349, 703 A.2d 941 (App.Div.1997).
R. 4:10-2(a) provides:
Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence . . . of any . . . electronically stored information. . . . It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to discovery of admissible evidence; nor is it ground for objection that the examining party has knowledge of the matters as to which discovery is sought.
*537 The relevance standard does not refer only to matters which would necessarily be admissible into evidence, but includes information reasonably calculated to lead to admissible evidence respecting the cause of action or its defense. Pfenninger v. Hunterdon Cent. Reg'l High Sch., 167 N.J. 230, 237, 770 A.2d 1126 (2001). Thus relevancy for purposes of R. 4:10-2(a) is congruent with relevancy pursuant to N.J.R.E. 401, namely, a tendency in reason to prove or disprove any fact of consequence to the determination of the action. Payton v. New Jersey Tpk. Auth., 148 N.J. 524, 535, 691 A.2d 321 (1997).
Consequently, whether the evidence would be admissible to impeach defendant's credibility pursuant to N.J.R.E. 607, as R.L. focuses on, or is inadmissible under N.J.R.E. 404(b), as defendant argues, is not relevant to the question of whether it was discoverable. As noted, R. 4:10-2(a) expressly covers "electronically stored information," the type of information at issue here. In addition, examination of the computers could have led to admissible evidence reflecting on whether defendant had sexual urges for children, such as pictures of R.L. or writings indicating that defendant had an improper relationship with R.L. Cf. K.S. v. ABC Prof'l Corp., 330 N.J.Super. 288, 291-92, 749 A.2d 425 (App.Div.2000) (holding that in hostile workplace sexual harassment action against partner of firm, other partners' sexual conduct with other employees not relevant for discovery purposes). Moreover, the judge did not allow R.L. unfettered access to the computers, but directed the parties to agree upon an independent expert to examine the computers.
Reversed on the appeal; the cross-appeal is dismissed as moot.
NOTES
[1] This is a fictitious name.