970 A.2d 1054 (2009)
407 N.J. Super. 253
Juan SERRANO and Edilberto Vivar, individually and on behalf of all other persons similarly situated who were employed by Underground Utilities Corp., Pipeline Equipment Co., Inc., and other related companies, with respect to certain public and private construction projects, Plaintiffs-Appellants/Cross-Respondents,
v.
UNDERGROUND UTILITIES CORP. and all subsidiaries, affiliates, joint venturers and other related entities, including, but not limited to Underground Utilities Concepts, Inc., Pipeline Equipment Co., Inc., and all subsidiaries, affiliates, joint venturers and other related entities, Ricardo Gomes, Jose Gomes and Sandra Gomes, Defendants-Respondents/Cross-Appellants.
No. A-0676-08T1
Superior Court of New Jersey, Appellate Division.
Submitted February 2, 2009.
Decided May 20, 2009.
*1057 Barnes, Iaccarino, Virginia, Ambinder & Shepherd, PLLC, attorneys for appellants/cross-respondents (Lloyd R. Ambinder and Michael J. DeSantis, of counsel; Mr. DeSantis, on the brief).
Phillips Nizer, LLP, attorneys for respondents/cross-appellants (N. Ari Weisbrot, of counsel and on the brief).
Before Judges CARCHMAN, SABATINO and SIMONELLI.
The judgment of the court was delivered in an opinion by
SABATINO, J.A.D.
By leave granted on cross-motions, we review a protective order issued in this case, a potential class action which involves allegations that defendant employers paid inadequate wages to their workers. The protective order at issue restricts, in part, discovery of information relating to the immigration status of the named plaintiffs and of the other putative class members.
For the reasons explained in this opinion, the protective order is affirmed, with certain modifications and subject to defendants' satisfactory presentation of a more specific and compelling evidentiary proffer on remand.

I.
The discovery dispute before us arises in the context of a putative class action filed in the Law Division by two named plaintiffs, Juan Serrano and Edilberto Vivar, on behalf of themselves and "all other persons similarly situated who were employed by defendants, Underground Utilities Corp. ("Underground"), Pipeline Equipment Co., Inc. ("Pipeline"), and other related companies, with respect to certain public and private construction projects." Plaintiffs and the other identified class members furnished labor as plumbers, steamfitters, and other construction workers for Underground and Pipeline on various government-financed public works projects. The construction projects included, among other sites, Exit 7A on the New Jersey Turnpike, several public roads in Andover and Sparta, a dam in Sparta, and a public golf course in Hamburg.
Underground[1] is a New Jersey corporation headquartered in Linden, and Pipeline is a New Jersey corporation headquartered in Union. According to the *1058 complaint, the president of Underground, defendant Jose Gomes, is related to the president of Pipeline, defendant Ricardo Gomes. The last named defendant, Sandra Gomes, is a relative of the two other individual defendants and is the incorporator and service agent for Underground.
The complaint alleges that Underground and Pipeline perform the same type of construction work for similar clientele. The complaint further alleges that Underground and Pipeline have shared the same employees and equipment. Moreover, the two companies are said to have conducted the same practices regarding their workers, including work hours, wages paid, and methods of payment.
On behalf of Serrano, Vivar, and the putative class members, the complaint seeks earned but unpaid overtime compensation, as well as prevailing wages and supplemental benefits. These sums are allegedly owed by defendants pursuant to the Fair Labor Standards Act, 29 U.S.C.A. §§ 207 and 216(b), (the "FLSA"), and under the New Jersey Prevailing Wage Act, N.J.S.A. 34:11-56.25 to -56.47 (the "PWA").
More specifically, the complaint alleges that on each work day, plaintiffs typically assembled at their respective employer's shop at about 5:30 to 6:00 a.m. At that time they were driven in employer-owned vans and trucks to defendants' various construction sites, where they would begin working at about 7:00 a.m. According to the complaint, the workers typically received only two breaks during the work day, for ten minutes at 9:00 a.m. and thirty minutes for lunch at midday. Plaintiffs allege that at some of defendants' job sites they would work until 4:00 p.m., while at other sites they did not stop working until 7:00 p.m. Plaintiffs contend that they were then routinely transported back to defendants' shop from their respective construction sites and did not typically leave the shop until between 7:30 and 8:30 p.m. The employees' work week was usually six days.
Plaintiffs contend that they customarily worked for defendants more than forty hours per week, but that all of their hours were nevertheless paid on a "straight-time" basis rather than at an overtime rate. Additionally, plaintiffs allege that they typically were paid only for their work hours at the project sites. Consequently, they were not compensated for work they performed at the shop, nor for their time spent traveling in the employers' vehicles between the shop and the project sites.
Based upon these allegations, plaintiffs contend that defendants violated Section 207 of the FLSA, which requires employers to pay overtime wages to non-exempt employees at one-and-a-half times the regular pay rate for work performed during a given week in excess of forty hours. 29 U.S.C.A § 207. Plaintiffs contend that defendants further violated the FLSA by not paying them for their time while they were working at defendants' shop and while being shuttled to and from the job sites. They allege these periods "typically amounted to between two and three hours per day" for each plaintiff.
The separate prevailing wage violations pleaded here under the PWA stem from defendants' alleged failure to compensate plaintiffs at the minimum pay rate required for workers on certain designated public works projects. According to the complaint, the putative class members typically received from defendants a regular hourly rate of pay between $9.00 and $17.00. Plaintiffs allege that those wage rates were beneath the prevailing wages mandated by N.J.S.A. 34:11-56.40.
Apart from these central statutory claims under the FLSA and the PWA, the complaint alleges that defendants are liable under theories of breach of fiduciary *1059 duty (for allegedly misusing public funds) and breach of contract. Similar common-law claims and claims under the FLSA, PWA, and other laws are asserted against the individual defendants, Ricardo Gomes, Jose Gomes, and Sandra Gomes.
By way of remedy, the complaint seeks damages for the past work that the class members performed, but for which they were insufficiently paid. Plaintiffs also demand counsel fees and the costs of suit. They do not seek injunctive or other prospective relief.
After initially moving unsuccessfully to dismiss the complaint on its face, defendants filed an answer. In their answer, defendants generally deny the complaint's operative allegations of statutory violations and common-law breaches. Defendants raise several affirmative defenses, none of them explicitly addressing the plaintiffs' residency or immigration status. Defendants also contend that the lawsuit was not properly brought as a class action, because it fails to meet the statutory requirements of numerosity, commonality, typicality of claims and adequacy of protective interests. See R. 4:32-1. A class has not yet been certified by the trial court.
The named plaintiffs, Serrano and Vivar, are immigrants from Ecuador. Apparently, many or all of the other putative class members[2] are originally from Central or South America. At the time of its filing, the complaint alleged that Serrano resided in Ridgewood, New York, and Vivar resided in Newark, New Jersey.
The pivotal discovery issues now before us concerning the workers' immigration status arose during the depositions of Vivar and Serrano. During both of those depositions, defense counsel made repeated inquiries of the named plaintiffs to elicit information about their respective residency and immigration status. In the course of such questioning, defense counsel showed Vivar and Serrano copies of various documents which they had each submitted to defendants in connection with their employment, including copies of their Social Security cards, employment eligibility (form I-9) verifications, and W-4 forms. Many of these questions drew objections from plaintiffs' counsel, who eventually sought the intervention of the trial court. Defense counsel asserted that he was delving into these subject matters only to explore issues of the plaintiffs' credibility, and not out of any specific intent to uncover or litigate their immigration status.
For example, defense counsel posed such questions as "Where were you born?"; "Why did you come to the United States?"; "Do you have with you picture identification?"; and "Do you have any other passports?" Defense counsel also probed into such topics as the addresses and telephone numbers of plaintiffs' relatives and the workplace of Serrano's father-in-law. At one point, defense counsel requested Serrano to take a photograph of his house and give it to his lawyer; he even offered to purchase a camera for that purpose during the lunch break. Defense counsel also asked Serrano to empty his pockets to confirm that he was not carrying additional identification.
As the result of defense counsel's inquiries into these subjects, Vivar and Serrano provided certain responses that were either internally inconsistent or were inconsistent with documents presented to them at their depositions. For example, Vivar testified that he has a Social Security number that is consistent with his 2002 and 2003 W-4 forms but is inconsistent *1060 with the two different numbers he reported on his 2000 and 2001 W-4 forms. Defense counsel also confronted Vivar with a notice from the Social Security Administration ("SSA") advising defendants that Vivar's reported Social Security number on his 2002 and 2003 W-4 forms did not match the SSA's records. Additionally, defense counsel elicited inconsistent answers from Serrano about his date of birth and his previous addresses.
Based on these inconsistencies, defense counsel asserted to the deponents that they were not telling the truth about matters concerning their residency and immigration status, accusing them multiple times of "lying." In particular, defense counsel suggested to Serrano that he was breaking the law by providing false information:
When you were sitting with the boys talking about how Underground is cheating you out of overtime even though they are paying more than double your last job, did any of the boys mention that it's against the law? Withdrawn. That you shouldn't give your employer false information about yourself[?]
Defense counsel also pointedly asked Serrano whether he was aware that he "might have to pay [the] company's attorneys fees" in the litigation.
When plaintiffs' counsel initially objected to these lines of inquiry at Vivar's deposition, the deposition temporarily halted and counsel had an impromptu telephone conference with the trial judge. As a result of that conference, counsel agreed to continue with the deposition, marking the objected-to questions for the court's future consideration in an anticipated application by plaintiffs for a protective order under Rule 4:10-3. A similar marking process took place at Serrano's deposition. Consequently, neither pre-class certification deposition of Vivar or Serrano was completed, but would be subject to the trial court's anticipated ruling.
Thereafter, the motion judge heard an application by plaintiffs' counsel for a protective order pursuant to Rule 4:10-3. In their application, plaintiffs sought to bar defense counsel from pursuing further discovery from either the named plaintiffs, or any of the other class members, concerning their immigration status, or abstract facts relating to that status. Plaintiffs also contended that the substance and manner of defense counsel's questioning was designed to intimidate the deponents from continuing to pursue the lawsuit, out of fear of possible deportation.
Defense counsel opposed the entry of a protective order. He contended that all of the information he elicited, or had attempted to elicit, was reasonably calculated to obtain relevant and admissible evidence bearing upon plaintiffs' credibility. Defense counsel denied any effort to intimidate or harass, arguing that the deponents' embarrassment or anxiety from the deposition questioning was a natural and self-inflicted consequence of their own conduct in making false statements to their employer at the time of their hire.
Endeavoring to balance the competing interests involved, the motion judge determined that a degree of protective relief was warranted, although not the complete bar upon the inquiries that plaintiffs had sought. The judge initially noted in his oral ruling that he would allow defense counsel to "ask a set of maybe two or three limited questions on this [immigration] issue in depositions." Such questions were to exclude queries about plaintiffs' present home addresses, a subject which the judge was persuaded lacked sufficient probative value in this case and one which had the capacity to raise fears of deportation. The judge also specifically prohibited defense counsel from seeking *1061 photographs of plaintiffs' houses and information about their fathers.
Consistent with his bench ruling, the judge instructed defense counsel to submit a form of order containing a list of proposed questions. The judge admonished that "if I think there's too many [questions] or if [plaintiffs' counsel] thinks there's too many[,] I'll eliminate them."
Pursuant to the court's instructions, defense counsel submitted a list of proposed questions to the court. After considering that proposed list, the court entered a protective order on July 30, 2008.
The protective order first directed each named plaintiff to appear for a continued deposition within five days after pre-certification depositions were first taken of defendants.[3] Additionally, the order specified that "in accordance with the [c]ourt's instructions, [d]efendants may ask only the following [c]ourt-approved questions of each named and putative class [p]laintiff at the continued pre-class certification depositions":
1. Are you a legal resident or citizen of the United States?
2. Are you currently present in the United States legally?
3. What documents, if any, did you submit to the [d]efendants at the time of your employment?
4. [After marking each document]: Is all the information reflected on this document true?
5. Is this your Resident Alien card?
6. Did you present this Resident Alien card to the [d]efendants at the time of your employment?
7. Is the information contained in this Resident Alien card true?
8. Were you aware of any false information contained in this Resident Alien card when you provided it to [d]efendants?
9. Is this your Social Security card?
10. Did you present this Social Security card to the [d]efendants at the time of your employment?
11. Is the information contained in this Social Security card true?
12. Were you aware of any false information contained in this Social Security card when you provided it to [d]efendants?
13. Is this your W-4 form?
14. Did you present this W-4 form to the [d]efendants at the time of your employment?
15. Is the information contained in this W-4 form true?
16. Were you aware of any false information contained in this W-4 form when you provided it [to][d]efendants?
17. Is this your I-9 form?
18. Did you present this I-9 form to the [d]efendants at the time of your employment?
19. Is the information contained in this I-9 form true?
20. Were you aware of any false information contained in this I-9 form when you provided it [to][d]efendants?
Plaintiffs timely moved for leave to appeal the protective order. They contended, in essence, that the twenty questions approved by the motion judge were excessive and not reasonably calculated to obtain information germane to their causes of action. Instead, plaintiffs alleged that the approved questions have the capacity to harass and intimidate the named plaintiffs and other class members. Plaintiffs argued that the motion judge inappropriately balanced the interests at stake under Rule 4:10-3 in favor of defendants, and *1062 that he gave inadequate attention to the prospects for intimidation.
Defendants, in turn, cross-moved for leave to appeal the protective order. They maintained that the limitations placed on discovery by the court were unnecessary, and that the court had unduly hampered defendants in obtaining relevant information bearing upon plaintiffs' credibility.
Both sides have supplied the court with a variety of judicial opinions from other jurisdictions addressing similar issues concerning the scope of permissible discovery delving into the immigration status of parties in a civil action. Plaintiffs contend that the majority of those cases prohibit, or at least severely curtail, discovery relating to a party's immigration status. Defendants, on the other hand, maintain that several of those out-of-state cases recognize that discovery of facts relating to a plaintiff's immigration status may be appropriate at times, insofar as such information may be indicative of a plaintiff's lack of credibility.
We granted leave to appeal. We presume that, in the interim, the disputed discovery has not proceeded, pending the guidance of this court on these issues of first impression in our State.

II.
Rule 4:10-3 allows a party from whom discovery is sought to obtain relief from the court to limit that discovery in appropriate situations. The Rule authorizes trial courts to make "any order that justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Ibid. Such a protective order specifically may direct, among other things, that "discovery may not be had," see Rule 4:10-3(a), or that "certain matters not be inquired into, or that the scope of discovery be limited to certain matters," see Rule 4:10-3(d). See, e.g., Isetts v. Borough of Roseland, 364 N.J.Super. 247, 262, 835 A.2d 330 (App. Div.2003) (reaffirming the trial court's authority to limit discovery where necessary to prevent annoyance, embarrassment, oppression or undue burden or expense); K.S. v. ABC Professional Corp., 330 N.J.Super. 288, 291-92, 299, 749 A.2d 425 (App.Div.), leave to appeal granted,[4] 165 N.J. 596 (2000) (reversing denial of protective order to prohibit discovery of individual defendants' sexual relations with employees other than plaintiff).
The limiting factors underlying Rule 4:10-3 must be weighed against the presumptively broad scope of discovery authorized in Rule 4:10-2 and other discovery provisions in our Rules of Court. As a general matter, Rule 4:10-2 instructs in its first sentence:
Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, electronically stored information, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.
[R. 4:10-2 (emphasis added).]
Moreover, the Rule provides in its second and final sentence:
It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to *1063 the discovery of admissible evidence; nor is it ground for objection that the examining party has knowledge of the matters as to which discovery is sought.
[Ibid. (emphasis added).]
It is a "well-established principle that requests for discovery are to be liberally construed and accorded the broadest possible latitude to ensure that the ultimate outcome of litigation will depend on the merits in light of the available facts." Piniero v. Div. of State Police, 404 N.J.Super. 194, 204, 961 A.2d 1 (App.Div.2008). This issue of relevancy "does not refer only to matters which would necessarily be admissible into evidence, but includes information reasonably calculated to lead to admissible evidence respecting the cause of action or its defense." R.L. v. Voytac, 402 N.J.Super. 392, 408, 954 A.2d 527 (App.Div.2008) (citing Pfenninger v. Hunterdon Cent. Reg'l High Sch., 167 N.J. 230, 237, 770 A.2d 1126 (2001)). Relevancy under Rule 4:10-2(a) "is congruent with relevancy pursuant to N.J.R.E. 401, namely, a tendency in reason to prove or disprove any fact of consequence to the determination of the action." Ibid. (citing Payton v. New Jersey Tpk. Auth., 148 N.J. 524, 535, 691 A.2d 321 (1997)). However, "the parties' discovery rights are not unlimited." Piniero, supra, 404 N.J.Super. at 204, 961 A.2d 1.
Mindful of the judiciary's important case management role in the pretrial process, a reviewing court will "normally defer to the trial court's disposition of discovery matters, including the formulation of protective orders, unless the court has abused its discretion" or the determination is based on an incorrect view of the law. Spinks v. Township of Clinton, 402 N.J.Super. 454, 459, 955 A.2d 298 (App. Div.2008) (internal quotations omitted); see also Wilson v. Amerada Hess Corp., 168 N.J. 236, 253, 773 A.2d 1121 (2001) (noting that generally the trial court has discretion to resolve discovery disputes); Payton, supra, 148 N.J. at 559, 691 A.2d 321 (same); Piniero, supra, 404 N.J.Super. at 204, 961 A.2d 1 (same).
We now apply these general principles to the particularized context of this lawsuit, one which is mainly brought under the FLSA and the PWA, and to defense counsel's inquiries on matters relating to plaintiffs' immigration or residency status. In doing so, we begin with a substantive discussion about the relevancy of plaintiffs' potential status as undocumented or illegal immigrant workers.[5]
Although certain other federal statutes have been construed otherwise, see, e.g., Hoffman Plastic Compounds, Inc., v. NLRB, 535 U.S. 137, 122 S.Ct. 1275, 152 L.Ed. 2d 271 (2002) (holding that plaintiffs' status as illegal workers precluded their unfair labor practice claims under the National Labor Relations Act), the law generally provides that resident aliens who are undocumented or unauthorized to work in this country are nonetheless entitled to seek enforcement of our labor laws, unless "the governing workplace statutory scheme makes legal employment a prerequisite to its remedial benefits." Crespo v. Evergo Corp., 366 N.J.Super. 391, 399, 841 A.2d 471 (App.Div.), certif. denied, 180 N.J. 151, 849 A.2d 184 (2004).
In Crespo, we specifically held that undocumented workers were barred from recovering prospective damages arising from their termination alleged to be in violation of the Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1 to -42. In reaching that conclusion, we considered *1064 the impact of the Immigration Reform and Control Act of 1986 ("IRCA"), 8 U.S.C.A. § 1324. Crespo, supra, 366 N.J.Super. at 395, 841 A.2d 471. That federal statute, among other things, makes it illegal for an employer to knowingly hire immigrants who are not authorized to work in the United States, or to continue employing them after learning that such persons are or have become unauthorized to work. 8 U.S.C.A. § 1324a(a)(1)(a) and (a)(1)(b).
However, as we recognized in Crespo, such undocumented workers can recover damages arising out of statutory violations for "work already performed," such as wage claims under the FLSA. Crespo, supra, 366 N.J.Super. at 398, 841 A.2d 471 (citing Zeng Liu v. Donna Karan Int'l, Inc., 207 F.Supp.2d 191, 192-93 (S.D.N.Y.2002); Singh v. Jutla & C.D. & R.'s Oil, Inc., 214 F.Supp.2d 1056, 1061-62 (N.D.Cal.2002)). See also Patel v. Quality Inn South, 846 F.2d 700, 706 (11th Cir. 1988) (noting that "[n]othing in the FLSA suggests that undocumented aliens cannot recover unpaid minimum wages and overtime under the act, and we can conceive of no other reason to adopt such a rule."); Zavala v. Wal-Mart Stores, Inc., 393 F.Supp.2d 295, 325 (D.N.J.2005) (holding that "[p]laintiffs should not be precluded, as a matter of law, from obtaining relief under the FLSA for work already performed, merely by virtue of their undocumented status."); Montoya v. S.C.C.P. Painting Contrs., Inc., 530 F.Supp.2d 746, 750 (D.Md.2008) (noting that "the protections of the Fair Labor Standards Act are available to citizens and aliens alike, regardless of documented or undocumented status.").
We also noted in Crespo that our case law has "not precluded illegal aliens from pursuing relief under our workers' compensation law." 366 N.J.Super. at 399, 841 A.2d 471 (citing Fernandez-Lopez v. Jose Cervino, Inc., 288 N.J.Super. 14, 17-18, 671 A.2d 1051 (App.Div.1996); Mendoza v. Monmouth Recycling Corp., 288 N.J.Super. 240, 248-49, 672 A.2d 221 (App. Div.1996)). Although no case to date has similarly addressed whether illegal workers are precluded under the PWA from recovering wrongfully withheld prevailing wages for work already performed, we presume, for purposes of our analysis of the discovery issues before us, that plaintiffs' potential status as undocumented or illegal workers does not bar them, per se, from obtaining retrospective compensation at the pay levels mandated by the PWA.
The definition of a "workman" or "worker" entitled to sue for recovery of his or her prevailing wages due under the PWA is not qualified, at least in the text of the statute, by a precondition of lawful citizenship. See N.J.S.A. 34:11-56.26(7). The analogous rationale of the FLSA cases involving wage-and-hour violations and undocumented workers logically would appear to pertain to the PWA as well.
As the United States District Court for the Eastern District of New York observed in granting FLSA protection to undocumented workers in Flores v. Amigon, 233 F.Supp.2d 462, 464 (E.D.N.Y. 2002), allowing such workers to sue non-compliant employers under the FLSA may advance the statute's policy objectives. In particular, such litigation may reduce incentives for employers to hire illegal workers to displace legal employees who would be entitled to be compensated at the pay levels mandated by the FLSA. As the court in Amigon observed:
Indeed, it is arguable that enforcing the FLSA's provisions requiring employers to pay proper wages to undocumented aliens when the work had been performed actually furthers the goal of the IRCA, which requires the employer to discharge any worker upon discovery of the worker's undocumented alien status. *1065 8 [U.S.C.A.] § 1324a(a)(2). If employers know that they will not only be subject to civil penalties, 8 [U.S.C.A.] § 1324a(e)(4)(A), and criminal prosecution, 8 [U.S.C.A.] § 1324a(f)(1), when they hire illegal aliens, but they will also be required to pay them at the same rates as legal workers for work actually performed, there are virtually no incentives left for an employer to hire an undocumented alien in the first instance. [Citation omitted.] Whatever benefit an employer might have gained by paying less than the minimum wage is eliminated and the employer's incentive would be to investigate and obtain proper documentation from each of his workers.
[Ibid. (emphasis added).]
Similarly, it is at least arguable that enforcing the PWA's provisions requiring employers to pay proper wages for work already performed, as to undocumented aliens, furthers the goals of the statute. Because this interlocutory appeal arises before substantive motion practice has occurred, we reserve any definitive ruling on these questions of legal entitlement to payment under the FLSA and the PWA for work already performed.
Assuming, for the sake of argument, that members of the putative class of plaintiffs who are undocumented or illegal workers may be entitled to back pay for work already performedas a remedy for any proven violations of the FLSA or the PWAwe must then assess whether, and to what extent, the defense may permissibly explore in discovery the immigration and residency status of those plaintiffs.
As the cases from other jurisdictions have recognized, discovery inquiries of litigants who happen to be immigrants, probing into their legal status to live and work in the United States, raises sensitive considerations. Such inquiries may have a chilling effect on those litigants when they attempt to vindicate their legal interests in the courts of our nation.
Although New Jersey courts to date have not addressed these specific issues in a published decision, a number of cases from other states and the federal courts have disclosed certain immigration-related discovery requests in civil litigation to be irrelevant and unduly prejudicial. The general rationale of such cases is that:
[w]hile documented workers face the possibility of retaliatory discharge for an assertion of their labor and civil rights, undocumented workers confront the harsher reality that, in addition to possible discharge, their employer will likely report them to the INS and they will be subjected to deportation proceedings or criminal prosecution.
[Rivera v. NIBCO, Inc., 364 F.3d 1057, 1064 (9th Cir.2004).]
These are realistic concerns. See, e.g., Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 886-87, 104 S.Ct. 2803, 2806, 81 L.Ed.2d 732, 740 (1984) (employer reported undocumented workers to the INS after they voted in favor of union representation); Fuentes v. INS, 765 F.2d 886, 887 (9th Cir.1985) (employer reported undocumented workers when they filed suit to recover wages owed), vacated by, Fuentes v. INS, 844 F.2d 699 (9th Cir.1988); Singh v. Jutla & C.D. & R's Oil, Inc., 214 F.Supp.2d 1056, 1057 (N.D.Cal.2002) (employer recruited and then reported an undocumented worker to the INS after he filed an FLSA claim for unpaid wages); Contreras v. Corinthian Vigor Ins. Brokerage, Inc., 25 F.Supp.2d 1053, 1055 (N.D.Cal.1998) (same).
The chilling effect of such status-related inquiries can extend even to lawful, documented immigrant workers. As noted by the court in Rivera:
Documented workers may fear that their immigration status would be *1066 changed, or that their status would reveal the immigration problems of their family or friends; similarly, new legal residents or citizens may feel intimidated by the prospect of having their immigration history examined in a public proceeding. Any of these individuals, failing to understand the relationship between their litigation and immigration status, might choose to forego civil rights litigation.
[Rivera, supra, 364 F.3d at 1065].
Thus, courts in other jurisdictions confronted with these discovery issues have typically engaged in a balancing that offsets these potential chilling effects against the probative value of the immigration-related information that is sought. See, e.g., Lozano v. City of Hazleton, 496 F.Supp.2d 477, 513-14 (M.D.Pa.2007) (taking into consideration that "inquiries into immigration status can have an in terrorem [] effect, limiting the willingness of plaintiffs to pursue their rights out of fears of the consequences of an exposure of their position" in deciding whether anonymous plaintiffs needed to be identified); Flores, supra, 233 F.Supp.2d at 464-65 (holding that the information was irrelevant and its minimal probative value outweighed by its potential for prejudice); Zeng Liu, supra, 207 F.Supp.2d at 192 (finding defendant's request to discover information relating to plaintiff's immigration status lacked sufficient relevance and was outweighed by the risk of injury to the plaintiffs, even if the parties were to enter into a confidentiality agreement). Cf. Zavala, supra, 393 F.Supp.2d at 325 (noting case law in which plaintiffs' immigration status was deemed "non-relevant information" and thus "the employer defendants in [those] FLSA actions were not entitled to discovery of the employees' immigration status").
Accordingly, several courts have denied defendants' requests to discover the addresses, Social Security numbers, and driver's license numbers of named plaintiffs and putative class members. See, e.g., Flores, supra, 233 F.Supp.2d at 465 (preventing defendant's discovery of the plaintiff's immigration documents, Social Security numbers, and passports in a suit seeking unpaid wages under the FLSA); Cabrera v. Ekema, 265 Mich.App. 402, 695 N.W.2d 78, 81 (2005) (holding that plaintiffs' Social Security numbers are not relevant to determining liability for unpaid wages in a suit under the FLSA and state law); Galaviz-Zamora v. Brady Farms, Inc., 230 F.R.D. 499, 500 (W.D.Mich.2005) (barring questions seeking plaintiffs' Social Security numbers; addresses of their private residences; tax returns (including all W-2s and 1099s); driver's licenses or identification cards; Social Security cards; passports; Alien Registration cards; Employment Authorization cards; voter's registration cards; United States birth certificate or Certificate of Birth Abroad issued by the United States Department of State).[6]
Apart from these widely-recognized concerns about the potential intimidation of litigants who may be undocumented workers, we also must be cognizant of the risks of undue prejudice if their illegal immigration status is disclosed to a jury at the time of trial. In that regard, Evidence Rule 403 authorizes trial courts to exclude proofs that, although relevant, may lack *1067 sufficient probative value to be admitted at trial, because countervailing factors such as undue prejudice or confusion of the issues may substantially outweigh such relevance. We anticipate that plaintiffs' counsel at trial would argue that such undue prejudice would be unavoidable if the jurors learned that any of the plaintiffs were illegal immigrant workers. Their illegal status in this country is very likely to trigger negative sentiments in the minds of some jurors.
The real-world concern facing the court is whether the disclosure of immigration status would sufficiently inflame or distract jurors from their roles as objective fact-finders. As our Supreme Court has instructed in applying Evidence Rule 403, "[e]vidence should be barred if its probative value `is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the basic issue[s].'" Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 491, 734 A.2d 1147 (1999) (citing State v. Thompson, 59 N.J. 396, 421, 283 A.2d 513 (1971)). For example, in Green, the Court ruled that the admission of proofs of racist attitudes harbored by a plaintiff in a motor vehicle accident case, although allegedly relevant to his credibility, would unduly antagonize jurors and would "drown out all weaker sounds" that might otherwise support its admissibility and "blunt its harmful impact." Id. at 501, 734 A.2d 1147.
If the present litigation were, for instance, a routine personal injury case or a malpractice action involving the medical treatment of a plaintiff at a hospital, we would have no trouble in concluding that the probative value of discovery inquiries relating to a subject such as a plaintiff's immigration status is at best negligible, unless the plaintiff is seeking future lost wages (contingent upon his or her legal ability to work) as part of his or her claimed damages. This litigation, however, is an employment-related action, which makes the balancing of the appropriate interests more difficult.
This is not a scenario in which plaintiffs' credibility is being attacked as to entirely collateral matters, such as prior falsehoods on a medical intake form or a school registration document. Rather, the scenario is one in which the credibility challenge pertains to the veracity of the documents that plaintiffs presented to obtain employment with these defendants in the first place. Their presence at defendants' job sites evolved from those documents, which we presume were relied upon by defendants when they were hired. Plaintiffs' credibility about the hours they worked for defendants and how they were compensated is indisputably a central facet of this case. In fact, defendants represent that there are no records that show overtime worked by plaintiffs, a lack of documentation that makes plaintiffs' credibility even more pivotal.
The evidentiary mechanics by which defendants might get such credibility-related proofs admitted at trial, however, have not been demonstrated in the briefs submitted to us on this appeal. That shortcoming is a critical one.
Defendants' intended aim is to impeach plaintiffs' credibility with proofs of prior inconsistent statements about their residency, Social Security numbers, and the like. Such impeachment with specific instances of untruthful conduct appears to be prohibited under Evidence Rule 608(a), which provides:
The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, provided, however, that the evidence relates only to the witness' character for truthfulness or untruthfulness, and provided further that evidence of truthful character *1068 is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise. Except as otherwise provided by Rule 609 and by paragraph (b) of this rule, a trait of character cannot be proved by specific instances of conduct.

[(Emphasis added).]
Unlike the analogous but different federal evidence rule permitting such proofs, see Fed.R.Evid. 608, cross-examination about specific instances of allegedly untruthful prior conduct cannot be used under N.J.R.E. 608(a) to attack a witness's character for truthfulness. See Fitzgerald v. Stanley Roberts, Inc., 186 N.J. 286, 309 n. 9, 895 A.2d 405 (2006) (noting that "[u]nlike the New Jersey [evidence] rule, however, the federal [evidence] rule permits broad questioning of all witnesses, including character witnesses, regarding prior instances of conduct on cross-examination"). This constraint in Evidence Rule 608, disallowing proof of specific instances of prior untruthful conduct, is explained by the Comment of the 1991 Supreme Court Committee on Evidence:
Although this rule [N.J.R.E. 608] follows the formulation of Fed.R.Evid. 608, it retains present New Jersey practice by rejecting the provision of paragraph (b) of the federal rule which permits limited admissibility of specific instances of conduct on cross-examination. N.J. Evid. R. 22(d), followed by this rule, prohibited "specific instances of conduct" proof in any form it introduced to prove a trait of character. Thus, this rule is consistent in philosophy and effect with the choice made in respect of Rule 405(a), namely adopting the state rather than the federal analogue. It is the Committee's view that Rule 607 affords sufficient scope for the effective impeachment of credibility.

[1991 Supreme Court Committee Comment, quoted in Biunno, Current N.J. Rules of Evidence 529 (2008) (emphasis added).]
Evidence Rule 608 does permit, however, credibility to be attacked or supported by evidence "in the form of opinion or reputation," provided that such evidence relates only to "the witness'[s] character for truthfulness or untruthfulness." N.J.R.E. 608(a).
Subject to the limitations of Evidence Rule 608 and a related character provision, Evidence Rule 405, Evidence Rule 607 provides authority under our Evidence Rules for "extrinsic evidence" of untruthful conduct to be used to impeach a witness's credibility:

Except as otherwise provided by Rules 405 and 608, for the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence relevant to the issue of credibility, except that the party calling a witness may not neutralize the witness' testimony by a prior contradictory statement unless the statement is in a form admissible under Rule 803(a)(1) or the judge finds that the party calling the witness was surprised. A prior consistent statement shall not be admitted to support the credibility of a witness except to rebut an express or implied charge against the witness of recent fabrication or of improper influence or motive and except as otherwise provided by the law of evidence.
[(Emphasis added).]
Evidence Rule 607 does not specify, with precision, the kinds of "extrinsic evidence" relevant to credibility that may be admitted under that Rule. Evidence Rule 607 does mention the impeachment of a witness with a "prior contradictory statement." However, it does so in the context of instructing that a party calling a witness *1069 "may not neutralize the witness'[s] testimony by [such] a prior inconsistent statement unless the statement is in a form admissible under Evidence Rule 803(a)(1)[7] or the judge finds that the party calling the witness was surprised." Ibid. By contrast, defense counsel here would not be the proponent calling plaintiffs to the stand at trial, but rather would be their cross-examiner.
Further guidance concerning the interplay of Evidence Rules 607 and 608 was provided by the Supreme Court in Reinhart v. E.I. Dupont De Nemours, 147 N.J. 156, 165-66, 685 A.2d 1301 (1996), in which the Court reversed a judgment for an employer in a workers' compensation case because the compensation judge had erroneously relied upon a transcript of a proceeding in a prior compensation case involving the same claimant. In that transcript, the judge had identified several inconsistencies in the claimant's testimony, leading to an express finding that the claimant had a "propensity to be untruthful." Id. at 162, 685 A.2d 1301. The Supreme Court ruled that the transcript was not admissible "as extrinsic evidence of past acts of untruthfulness." Id. at 166, 685 A.2d 1301. Defense counsel disavowed any attempt to use the transcript for that purpose, but rather claimed that it was being used "to impeach [claimant's] testimony regarding her condition by demonstrating that her complaints overlapped those for which she had received compensation in the [prior] proceedings." Ibid. The Court noted that such a professed use was allowable "to attack [the claimant's] credibility," but that the compensation judge had exceeded the proper scope of its permissible use. Ibid. Specifically, the Court faulted the judge for "using the transcript to buttress his conclusion that petitioner had been untruthful on more than one prior occasion and that she had the tendency to be untruthful." Ibid.
Viewed collectively, the texts of Evidence Rules 607 and 608, the associated commentary from the Supreme Court Committee, and related case law, operate to prohibit defendants from using prior false statements by plaintiffs about their immigration status as specific instances of past untruthful conduct in order to show a general character trait of dishonesty. Subject to that "specific instance" prohibition, Evidence Rule 607 does allow extrinsic evidence of a witness's lack of credibility to be admitted. However, the defense has not demonstrated to us how it could take advantage of that rule with proofs gathered in discovery showing that plaintiffs had presented falsehoods when they were hired by defendant.
If, for the sake of argument, such falsehoods were characterized as "prior inconsistent statements" admissible under Evidence Rule 607, that begs the question of what relevant testimony could be elicited at trial as a predicate to enable defense counsel to show such contradictions. For instance, we fail to see how defense counsel would have any relevant and admissible grounds to ask a plaintiff in this case at trial "What is your Social Security number?" in the hopes of laying a foundation to then confront that same plaintiff with an inconsistent Social Security number that he or she presented at an earlier time.
Notably, defendants do not discuss Evidence Rules 607 or 608 in their appellate brief. Consequently, we are left uncertain as to how, if at all, defense counsel would be able to navigate those rules in attempting to make use of past falsehoods by plaintiffs that were uncovered in discovery.
We are mindful that the liberal standards of relevance and discoverability in *1070 our Rules of Court encompass not only matters "which would necessarily be admissible in evidence, but [also] include information reasonably calculated to lead to admissible evidence respecting the cause of action or its defense." Pressler, Current N.J. Court Rules 1364 (2008), Comment 1 to R. 4:10-2; see also Pfenninger, supra, 167 N.J. at 237, 770 A.2d 1126; In re Liquidation of Integrity Ins. Co., 165 N.J. 75, 82, 754 A.2d 1177 (2000). Even so, the likelihood of defendants generating such admissible proofs from their immigration-related inquires is exceedingly doubtful. Defendants have not argued to us that discovery into employment-related false statements by plaintiffs would lead to other witnesses who could offer negative opinions or reputation testimony about plaintiffs' truthfulness admissible under Evidence Rule 608(a). Moreover, the ultimate admissibility of such testimony at trial would be subject to the formidable offsetting considerations under Evidence Rule 403 that we have already described.
These difficult admissibility issues cannot all be definitively resolved in the abstract at this juncture, where the competing arguments favoring and opposing exclusion are not crystallized or presented in a full context. Nor do we have any specific evidentiary ruling by the trial court to review. Although we have serious doubts about whether an acceptable basis for admission ultimately will be articulated by the defense that could surmount the evidentiary bar of Evidence Rule 403, such potential theories cannot be conclusively ruled out on the present record.
That being said, we categorically reject defendants' position that the discovery of any immigration-related information that bears upon plaintiffs' credibility is, as a per se matter, fair game. Such an unlimited approach deficiently ignores the adverse potential chilling effect upon immigrant workers that we have already described, and the potential for inflammatory prejudice at the time of trial.
A few decisions from other jurisdictions have addressed whether protective orders should limit discovery of immigration status in employment matters where defendants have similarly argued that their inquiries bore upon the credibility of the plaintiff employees. Instructively, in at least two of those cases, the court's analysis was affected by whether the defense already possessed documentation reflecting that the employees had presented false information at the time they were hired.
In particular, in Avila-Blum v. Casa de Cambio Delgado, Inc., 236 F.R.D. 190, 192 (S.D.N.Y.2006), defendants sought discovery regarding plaintiff's "responses in employment-related documents," including documents implicating the plaintiff's immigration status, "as potential impeachment evidence." The federal district court noted that "a witness's credibility is always at issue and may be tested in a variety of ways without imposing an undue burden on a party." Ibid. The court held that "if [d]efendants possess any documentation supporting their assertion that [plaintiff] may have falsified employment records, or have a good faith basis substantiating such a belief, properly limited and narrowly tailored examination in deposition and at trial may be permissible without opening broader collateral issues pertaining to [plaintiff]'s immigration status." Ibid.
Similarly, in Mischalski v. Ford Motor Co., 935 F.Supp. 203, 208 (E.D.N.Y. 1996), defendants argued that "plaintiff obtained a Social Security number and driver's license under false pretenses in order to obtain full-time employment unlawfully." However, because the defendants did not provide "any specific evidence to support its contention" the court did not allow *1071 defendants to inquire as to plaintiff's immigration status. Id. at 208.
Here, with respect to the two named plaintiffs, Vivar and Serrano, defendants have presented documentation and have elicited discovery responses that raise questions as to whether both of those individuals had given false information to defendants at the time they were hired. The named plaintiffs' circumstances are thus distinguishable in this regard from the scenario in Mischalski, in which no such arguably-falsified documentation was presented.
Given the incomplete state of the present record, the non-specific nature of defendants' claim of entitlement to impeach plaintiffs' credibility with status-related proofs, and the realistic prospects for intimidation and undue prejudice, defendants should be required to present a more specific and compelling proffer of admissibility before any further inquiries are posed to plaintiffs and to the other putative class members concerning their residency and immigration status. Such an evidentiary proffer must make specific reference to Evidence Rules 403, 607, and 608, as well as any other pertinent evidence rules, explaining how the proofs that defendants are now attempting to obtain would legitimately be admitted at trial. A generalized invocation of witness "credibility" issues will not suffice. Defendants must present such a proffer to the trial court, with an opportunity for plaintiffs to present opposing arguments. The trial court shall then consider whether that proffer suffices to justify any further discovery about the immigration and residency issues implicated by this appeal.[8]
If the proffer is unsatisfactory to the trial court, further discovery relating to plaintiffs' immigration and residency status shall be disallowed, and the protective order revised to reflect that greater prohibition. If, on the other hand, defendants present a satisfactory proffer[9] of likely admissibility, a limited exploration of these subject matters may be conducted in discovery, subject to certain modifications of the existing protective order that we now set forth.
If, and only if, a compelling evidentiary proffer is advanced on remand, the last eighteen questions set forth in the present protective order may be asked or re-asked of the two named plaintiffs. Those questions go to information already contained in the documents that Vivar and Serrano presented at the time of their respective hires. Reasonable follow-up questions on these subjects, such as those clarifying the deponents' responses or attempting to refresh recollection, may be permitted, subject to the trial court's oversight and discretion. The deponents may, of course, decline to respond on self-incrimination grounds, if appropriate, although neither of the two named plaintiffs so far have invoked the Fifth Amendment privilege. We also endorse the motion judge's admonition *1072 to counsel in his bench ruling that further questioning of plaintiffs should be conducted in a courteous fashion, without "harassing them."
However, we are convinced that, irrespective of defendants' ability to present a more specific and compelling evidentiary proffer on remand, the first two questions listed in the protective order[10] are patently too far afield and too prone to cause intimidation to warrant exploration by defense counsel. Consequently, we modify the protective order as to the named plaintiffs and excise those two questions, which shall not be asked when and if the depositions resume. By way of further protection, the information elicited in questions 3 through 20 shall be used by defendant employers for purposes of this litigation only, unless the trial court authorizes greater disclosure or unless other law requires such disclosure.
With respect to the unidentified members of the putative class,[11] we agree with the motion judge that (again, assuming a compelling evidentiary proffer is made on remand) it is reasonable to allow inquiry of them about their resident alien cards, Social Security cards, W-4 forms, and I-9 forms if, and only if, the employer already has such documents in its business files. If, however, copies of such documents are not already in the employers' business records, we hold that deposition questions or interrogatories relating to such documents, or to the veracity of other putative class members concerning such documents, should not be permitted. Defendants may not satisfy this requirement by demanding the turnover of those documents, if they are not already in the defendants' business files, as a predicate to plaintiffs' depositions.
Consequently, we disallow all of the questions embodied in questions 3 through 20 of the protective order as to any plaintiffs other than Vivar and Serrano, unless such a foundational documentary showing as to the deponent is made. If such a foundation is laid, the pertinent question(s) from that list may be posed, again with reasonable follow-ups by counsel permitted in the trial court's discretion. The previously-described limitations on disclosure outside of this litigation shall also pertain. Questions 1 and 2 are also disallowed, for the same reasons we noted as to the named plaintiffs.
We further sustain the motion judge's bench ruling precluding the defense from insisting upon the current residential addresses of each plaintiff. We are mindful that Rule 1:4-1(a) generally requires the first pleading of a party to divulge that party's residential address. However, given the nature of the issues in this case and the apparent immigration status of most or all of the workers involved, we discern no necessity for those workers' most current residential addresses to be supplied to defense counsel after the initial pleading. Since plaintiffs are all represented by counsel, there is no right or need for the defense to communicate with them directly. See R.P.C. 4.2 (prohibiting opposing counsel from communications with an adversary's client, absent consent). We perceive no relevance to inquiries into whether plaintiffs have changed their residences while the litigation has been pending. The trial judge did *1073 not misapply his discretion on this particular issue.
Lastly, we briefly note that the motion judge's bench decision correctly prohibited defense counsel's inquiry into such plainly-collateral matters as the employment and residency of plaintiffs' family members, and in admonishing defense counsel from seeking production of a photograph of any plaintiffs' residence. On remand, we trust that the trial court will continue to apply its sound judgment in curtailing such excessive inquisitions and in assuring, with the professionalism of both counsel, that a proper, unintimidating tenor is maintained at any ensuing deposition sessions and that all deponents are treated respectfully.
We conclude with a cautionary note. We have been presented here with a discrete protective order regulating the discovery of immigration and residency information in a discrete case involving discrete substantive claims. We have sustained that protective order with certain modifications and conditions, attempting to balance the competing interests at stake in this particularized context. In doing so, we do not suggest that the boundaries of inquiry crafted for this case necessarily represent a "model" that needs to be rigidly adhered to in different factual settings.
The protective order of July 30, 2008, is affirmed, as modified, and subject to the conditions that we have expressed herein. The case is remanded for the completion of discovery and further proceedings consistent with this opinion. We do not retain jurisdiction.
CARCHMAN, P.J.A.D., (concurring).
I concur in Judge Sabatino's thoughtful opinion as to the result and adoption of procedures to be utilized by the motion judge in considering the proffered questions for consideration during discovery.
I urge that we go further and suggest that the proper methodology for balancing the Evidence Rule 403 factors is to start with a presumption that any inquiry into matters of immigration status is not appropriate and place the burden on the proponent to demonstrate, beyond the issue of credibility, why such inquiry is germane to the issues in dispute. In adopting this view, I have serious concerns about the questions proffered by defendants and whether the purported reasons for such inquiries would overcome the presumption. I am of the view that such inquiries are not directly relevant to the issues here and would disallow them.
This litigation seeks recovery for past wages that may be due and owing to plaintiffs and the class they represent. No matter what their immigrant status, if plaintiffs establish that they worked the asserted hours, they are entitled to payment. Crespo v. Evergo Corp., 366 N.J.Super. 391, 398, 841 A.2d 471 (App. Div.) (citing Zeng Liu v. Donna Karan Int'l, Inc., 207 F.Supp.2d 191, 192-93 (S.D.N.Y.2002)), certif. denied, 180 N.J. 151, 849 A.2d 184 (2004).
Judge Sabatino's opinion recognizes that the inquiry into immigration status mandates consideration of whether the probative value of such inquiry outweighs its prejudicial value. N.J.R.E. 403. According to defendants, the thrust of their inquiries is plaintiffs' credibility.
Credibility is the baseline in any litigation involving disputed issues of fact. My concern is that beyond credibility and unless directly relevant to the issues in dispute, inquiries into matters of immigration status, including employment issues, are so fraught with the potential for undue prejudice that little more will be heard or considered after the salvo of inquiry into such status.
*1074 The case law cited in Judge Sabatino's opinion demonstrates that immigration status is not a relevant consideration in Fair Labor Standards Act and Prevailing Wage Act disputes, supra, at pp. 19 to 27. Even during discovery, such inquiry has no place as well unless a meaningful nexus can be demonstrated to overcome the obvious prejudice that will follow from such inquiry.
With this limited caveat, I concur.
Judge SIMONELLI joins in this concurring opinion.
NOTES
[1] Underground is also referred to at times in the record as "Underground Utilities Concepts, Inc.," which may be a related business entity.
[2] Although plaintiffs' counsel has estimated that the potential class members could be as many as one hundred persons, the named plaintiffs at their depositions respectively could identify no more than fifteen.
[3] This aspect of the protective order is not challenged on appeal.
[4] There is no subsequent reported history of this case or any opinion of the Supreme Court.
[5] A recent study reported that as many as 550,000 illegal immigrants live in New Jersey. See Pew Hispanic Center, A Portrait of Unauthorized Immigrants in the United States, April 14, 2009, http://pewhispanic.org/files/reports/107.pdf.
[6] Several law review articles have addressed these issues, with differing perspectives. See, e.g., Jennifer C. Chang & Christopher Ho, Drawing the Line After Hoffman Plastic Compounds, Inc. v. NLRB: Strategies for Protecting Undocumented Workers in the Title VII Context and Beyond, 22 Hofstra Lab. & Emp. L.J. 473, 485-92 (2005); Keith Cunningham-Parmeter, Fear of Discovery: Immigrant Workers and the Fifth Amendment, 41 Cornell Int'l L.J. 27 (2008); Patrick Hicks, Esq. & Deborah Westbrook, Esq., Immigration Status as a Defense to Employment-Law Claims, 15 Nev. Lawyer 26 (2007).
[7] The hearsay exception for certain prior inconsistent statements.
[8] Judge Carchman's concurring opinion rightly emphasizes the dangers of intimidation and prejudice flowing out of indiscriminate discovery inquiries into plaintiffs' immigration status. The entire panel joins in his suggestion that a presumption against discovery of plaintiffs' immigration status should be applied on remand, and that defendants should bear the burden of overcoming that presumption. It should also be noted that the entire panel agrees that, on remand, defense counsel is obligated to present a compelling and more specific evidentiary proffer to justify any discovery inquiries into plaintiffs' immigration status. The sole disagreement within the panel concerns whether or not that demonstration must advance a compelling theory of admissibility distinct from credibility impeachment.
[9] The court would not be bound by that preliminary ruling of admissibility at the time of trial, but would have the opportunity to reconsider plaintiffs' objection to the evidence.
[10] "Are you a legal resident or citizen of the United States?" and "Are you currently present in the United States legally?"
[11] In reviewing the aspects of the protective order relating to other potential class members, we offer no views about whether class certification is or will be appropriate in this case.